# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

|  |  |
|---|---|
|  | Case No: 0976 3:18 CR 00026-001 |
|  | U.S.M. #19373-023 |
| **UNITED STATES OF AMERICA** | Pro Se Motion For Compassionate Release |
|  | and/or Sentence Reduction |
| v. | under |
|  | 18 USC § 3582 (c)(1)(A)(i) |
| **ADAM ARROW WEINBERGER** | Date: _____ , Time: _____ |

## OPENING

Comes now the movant, acting pro se, in the above styled action and Prays this Honorable Court to grant relief in movant's pursuit of same, under 18 U.S.C. § 3582(c)(1)(A), the "First Step Act" (F.S.A), Title VI, Section 603 and it's attendant amendments to 18 USC § 3582(c)(1)(A), that became law in December, 2018; as well as any avenues towards this end that this Honorable Court may deem appropriate under the letter and/or spirit of the COVID-19 relief bill titled the "CARES Act," which became law March 27, 2020; all of which, movant would hold, was and continues to be an earnest attempt to provide avenues of relief from the effects of the COVID-19 pandemic.

(continued)

1

# OPENING

Movant would further Pray that this Honorable Court see fit to construe this, as well as any other related motions, petitions, briefs, responses, and/or rebuttals, in connection with the above styled action, liberally. Movant is not a lawyer, nor has he benefit of Law School. As such movant is profoundly ignorant of the many procedural rules of Federal District Court.

In support of this Prayed for lee-way, please see (Simpson v. Evans, 525 F. App'x 535, (9th Cir. 2013)) ("[P]ro se habeus petitioners are often not well versed in the complex procedural rules that govern federal habeus petitions. For this reason [a] document filed pro se 'is to be liberally construed' (internal quotation marks omitted))

In conclusion of the OPENING of this 18 U.S.C. § 3582(c)(1)(A)(i) motion, movant would posit that he has little grasp or understanding of the "complex procedural rules" in other types of filings, either. None the less, movant intends to do his best.

# BACKGROUND

On October 25 2013, after having previously pled guilty to: Title 21 § 841(a)(1) Possession With Intent to Distribute Methamphetamine; movant was sentenced by this Honorable Court to a term of imprisonment in the custody of the Bureau of Prisons of 92 months, followed by 96 months of Supervised Release. Movant's current date of release is June 24 2024.

Movant is currently housed in Lompoc FCI, which was the epicenter of the COVID-19 Pandemic in the BOP, with over a 90% positive infection rate amongst inmates. [...]

## COVID-19 IN LOMPOC

While the current Pandemic has severely affected the Bureau of Prisons facilities Nationwide Lompoc FCI was especially hard hit please see: (Office of the Inspector General's Pandemic Response Report 20-086). In addition to the apparent inability of the Executive Staff to prevent staff from introducing COVID-19 to the inmate population, despite a prison, which is surrounded by 2-3 layers of 10' tall chain link fence with multiple rolls of razor wire, being the closest thing to a hermetically sealed community, the Health Services department was grossly under-staffed, please see: Office of the Inspector General's Pandemic Response Report 20-086 (hereafter O.I.G.'s Report).

The COVID-19 pandemic ("has produced unparalled and exceptional circumstances [that] affect every aspect of life as we have known it"), please see: (Cameron v. Bouchard, LVP-20-10949, 2020 U.S. Dist. LEXIS 8903, 2020 WL 2569868, at *1 (E.D. Mich. May 21 2020)).

It's however especially difficult or impossible to socially distance oneself in a penal setting, particularly in a dorm style setting. Prisoners have had limited ability to isolate themselves from the threat posed by the CORONA-19 virus, please see: (Seth, 2020 U.S. Dist. LEXIS 89674, 2020 WL 2571168, at *2), see also: (Cameron, 2020 U.S. Dist. LEXIS 89083, 2020 WL2569868, at *1).

It is not movant's intention to lament the endless litany of horrors inflicted on the helpless charges in the Bureaus' care, but they are many. The movant's personal experience at Lompoc F.C.I. has been and is extremely trying, both physically and mentally, as well as emotionally. It did not have to be this way... A large portion of the following is direct quotes from the inspector generals report:

(OIG's Pandemic Response Report 20-026)

## "Summary of Inspection Results"

"The findings of the OIG's remote inspections are as follows:

• A preexisting shortage of medical staff at Lompoc was among the biggest challenges in mitigating COVID-19 transmissions because of the burden of screening inmates and staff members for COVID-19 symptoms while still providing routine medical care to the institutions' approximately 2,700 inmates.

• An insufficient number of correctional staff members resulted in Lompoc officials delaying full implementation of staff movement restrictions until 15 [actually 35 pg 2 par 1 (d)] days after the BOP directed Institutions with COVID-19 cases to further modify operations to maximize social-

(continued on next page)

4

- distancing in facilities to help control the spread of infection. [It should be noted here that the Acting Warden waited over a month before even notifying his staff of this directive.]

• Lompoc's initial screening process was not fully effective. We identified two staff members who came to work in March [2020] after experiencing COVID-19 symptoms and whose symptoms were not detected in the screening process to preclude them from working. [This was due to Health Services failure at this late date to implement H.S. Director's January 31 issued guidance protocol, pg. 3 para 2 (id.)]

• Lompoc staff did not seek to test or isolate an inmate who reported March 22 [2020] that he began having COVID-19 like symptoms 2 days earlier and who was examined on 4 separate days between March 22 [2020] and March 26. The local hospital tested the inmate for COVID-19 on March 27 [2020] and his results came back positive on March 30, [2020].

• The lack of permanent leadership team and the physical characteristics of Lompoc facilities contributed to deficiencies in Lompoc's response to COVID-19.

• The OIG's BOP wide survey in late April reflected that Lompoc staff identified as immediate needs at that time more personal protective equipment for staff and hygiene supplies for inmates, additional staff to cover posts and more space to quarantine inmates.

• The BOP's use of home confinement in response to COVID-19 at FCC Lompoc in April [2020] as a mechanism to reduce either the at risk inmate population or the overall prison population in order to assist with social distancing, was extremely limited. As of May 13 [2020] over 900 Lompoc inmates had contracted COVID-19 and we determined that only 8 inmates had been transferred to home confinement in accordance with BOP guidance." (id., pg. ii)

Movant would hold that the foregoing, as well as forthcoming quotes from the O.I.G.'s Pandemic Response Report would suffice on their weight alone, to be quite alarming in their own right. When combined, these failures on the part of the Executive Staff at F.C.C. Lompoc, as well as the Western Regional Office and the Washington D.C. Central Office of the Bureau of Prisons leave the BOP indicted by the Department of Justice's own Office of the Inspector General.

Movant would posit that the many failures documented in the O.I.G.'s Pandemic Response Report 20-086, on their own merit, do suffice to clear the bar of "extraordinary and compelling reasons", as set forth and delineated under 1B1.13 cmt. N. 1 (D) to wit: (Other Reasons-As determined by the the Director of the Bureau of Prisons there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).)

As documented in the O.I.G.'s Report (O.I.G.'s P.R.R. 20-086, pg. 3, para. 2) dereliction of the B.O.P.'s mandate to keep it's charges safe, began at least as early as January 31 2020 when the Bureau's Health Services Division issued it's "guidance" memorandum". Even at that early date the memo explained in detailed language exactly what symptoms for the BOP's myriad institutions and facilities to be aware and on the look out for. The list of symptoms included ("fever, chills cough, shortness of breath, headaches, body or muscle aches, vomiting, and diarrhea") on the same page and paragraph, the O.I.G. goes on to point out that ("On February 29, the BOP directed institutions to screen staff with potential COVID-19 risk factors, including staff members who have been in close contact with individuals diagnosed with COVID-19 or staff who had traveled within the previous 14 days through or from locations identified by the CDC as increasing epidemiological risk") (id. pg. 3, para. 2).

In the third paragraph of that same page, the O.I.G. notes that ("On March-

- 13 [2020], the BOP issued a further directive instructing institutions in areas with "sustained community transmission" which included Lompoc to implement enhanced health screening "of all staff") (id.). Also on March 13 [2020] ("... the BOP directed Wardens to immediately "implement modified operations to maximize social distancing in [BOP] facilities," to the extent practicable") (id., pg. 2, para. 1). On that same day, (... the BOP Western Regional Office directed Lompoc to implement these measures and to "develope a plan to minimize, and if possible eliminate staff movement between the U.S.P., F.C.I., and Camp.") (id.).

However, it was not until April 14, [2020], that the acting Complex Warden sent a memorandum to all staff members stating that "compartmentalization of staff, to limit working at different facilities..., will begin no later than April 15", (id.), which was more than two weeks after Lompoc had identified it's first COVID-19 cases, and more than a month after issuance of said directives.

Despite timely notice from the Western Regional Office as well as the Central Office in Washington, D.C., despite having been forewarned about specific symptoms far more inclusive than just the elevated temperature bar required by Lompoc F.C.I's Health Services Staff before quarantining inmates, the failures of Lompoc's Executive Staff and Health Services are manifest. Their lack of prompt action in implementing Washington's and Region's guidance, resulted in failure of epic proportions and reeks of apathy and/or gross incompetence, in the offices of senior leadership. That the Acting Complex Warden waited in excess of a month before he instituted compartmentalization of staff, despite having been specifically directed to do so by Washington's Central Office, ostensibly the Acting Complex Warden's superior, as well as the Regional office, a course of action that inarguably contributed to the speedy infection of hundreds of Lompoc's helpless inmates, including movant, is unpardonable. Their failures, while quite shocking to the conscience, in no way-

## COVID-19 IN LOMPOC

are limited to Executive Staff at F.C.I Lompoc. Movant would hold that the Senior Leadership by no means held a monopoly on failures, carelessness, and apathy. It was and is endemic Complex wide.

The OIG, at several points attempts to minimize staff's culpability for this catastrophic failure of trust by minimizing some of the failures of its sister agency. It is notable that despite never speaking to or surveying any of the inmates affected, with only half of F.C.C. staff responding to a remote survey the reported failures still fill a multi-page study. This Honorable Court only has to peruse the Office of the Inspector General's Pandemic Response Report 20-086. The ugly truth continues to rare its inconvenient head throughout. An apt three word summary of that Report would truly be "Extraordinary and Compelling".

The movant would hold that the previously mentioned, as well as forthcoming, quotes from the Office of the Inspector General's Pandemic Response Report 20-086 are sufficient on their weight alone, to be quite alarming, and when combined with additional facts and findings, will in summary suffice to clear the bar of "extraordinary and compelling reasons" as delineated under 1B1.13 cmt. n. 1 (D) to wit: (Other Reasons - As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than or in combination with, the reasons described in subdivisions (A) through (C).)

The movant would posit that the above and following factors militate towards this Honorable Court granting relief.

On January 31, the BOP issued it's first "guidance" memorandum, and even at this early date it was explicit in what Health Services should be on the lookout for, (OIG's PRR 20-086, pg. 3, para. 2) "On January 31, the BOP's Health Services Division issued a memorandum to all BOP institutions informing them of possible COVID-19 symptoms, including fever, chills, cough, shortness of breath, headaches, body or muscle aches, vomiting, and diarrhea").

## COVID-19 IN LOMPOC

On the same page of that report, in the same paragraph, the OIG points out that ("On February 29, the BOP directed institutions to screen staff with potential COVID-19 risk factors, including staff members who have been in close contact with individuals diagnosed with COVID-19 or staff who had traveled within the previous 14 days through or from locations identified by the CDC as increasing epidemiological risk). In the third paragraph of that same page of the report it is noted that, ("On March 13, the BOP issued a further directive instructing institutions in areas with 'sustained community transmission' which included Lompoc, to implement enhanced health screening of all staff"). On that same day, (OIG: PRR. 20-036 pg. 2, para. 1) ("... the BOP directed Wardens to immediately implement modified operations to maximize social distancing in [BOP] facilities, to the extent practicable") Also on March 13, (id.) ("... the BOP Western Regional Office directed Lompoc to implement these measures and to 'develope a plan to minimize, and if possible eliminate staff movement between the U.S.P. F.C.I. and Camp.') However it was not until April 14 that the acting Complex Warden sent a memorandum to all staff members stating that ("compartmentalization of staff to limit working at different facilities... will begin no later than April 15'"), which was more than 2 weeks after Lompoc had identified it's first COVID-19 cases, and more than a month after issuance of said directives.

Despite ample notice from both Washington and the Western Regional Office, despite having been forewarned about specific symptoms that may be evident, Lompoc's Executive Staff's as well as Health Services' lack of prompt action in implementing Washington's and Region's guidance, resulted in a failure of epic proportions and Lompoc's staff's failure to follow through reeks of apathy, and/or gross incompetence, in the offices of senior leadership. That the Acting Complex Warden waited in excess of a month before he instituted compartmentalization of staff, despite having been directed to do so

9

by Washington's Central Office, as well as Western Regional, shocks the conscience. The movant would hold that Executive Staff and senior leadership by no means held a monopoly on carelessness and apathy. Indeed it was and is endemic, Complex wide.

While the OIG attempts, on numerous occassions in it's report, to minimize the obvious faults and shortcomings of it's sister Agency (the BOP), the ugly truth continues to rare it's inconvenient head throughout.

(OIG:PRR 20-036, pg. 4 para. 1)("We determined that... [Lompoc's] initial screening process was not effective.... In one case, the symptoms the staff member was experiencing were not included in the screening tool in place at Lompoc at that time, even though one of the staff member's symptoms was listed in the BOP's January guidance. As a result, the staff member was allowed to work at the institution despite experiencing those symptoms.") As bad as this reality was, the BOP appeared more concerned with saving face and wasn't at all hesitant to dissemble when confronted with a formal draft of the report. ("The screening tool in place at the time included fever, cough, and shortness of breath and did not include other possible COVID-19 symptoms, such as headaches and diarrhea identified in the January BOP guidance. The BOP stated in response to the formal draft of this report that this staff member did not experience any COVID-19 symptoms while working at the institution and developed fever cough and a sore throat and was tested for COVID-19 on March 26. The testomonial evidence we obtained during our inspection indicated that there was at least 1 day that this staff member was symptomatic while working at Lompoc." (id))

("In the other case, the staff member was experiencing one of the symptoms that was included in the screening tool but the staff member did not report it because, he told [the OIG] he did not think it was COVID-19 related" (Id.) (note 16) (The BOP

[redacted/blacked out text]

## COVID-19 IN LOMPOC

staff member told the OIG that while he experienced the onset
of diarrhea on March 23 and a dry cough on March 26, he cleared
BOP screening procedures because he did not have a fever and
did not report to screeners his cough, which Lompoc staff were
screening for at the time. This staff member told us that when he
returned to FCC Lompoc after 2 weeks, the institution was
conducting a more in-depth screening for staff symptoms and was
denying entry for staff members when they reported symptoms other than
fever.) (This staff member worked at Lompoc for 7 days after experiencing
his first COVID-19 symptom and before he tested positive for COVID-19 in
early April. (id)) (OIG: PRR 20-086, pg. 4, para. 2) ("In addition, numerous
Lompoc staff responding to our survey raised concerns about the
effectiveness of staff screenings. Several Lompoc staff reported that
non-medical staff were conducting at least some of the screenings
and that the institution was not always examining (pg. 5, para. 1) (id).
staff for COVID-19 symptoms other than fever. Lompoc officials
confirmed the use of both medical and non-medical staff...") but
claimed they trained them first. Interestingly, Lompoc did not describe
what that meant ("[The OIG] believed that the limitations of the
BOP's staff screening procedures in March, coupled with Lompoc
staff who did not report all COVID-19 symptoms to screening staff,
may have contributed to the COVID-19 outbreak across FCC Lompoc)
(id). The movant would posit that the OIG "may" be being disingenuous here.
On March 22, an inmate informed staff that (OIG: PRR 20-086,
pg. 5, para. 3) ("he had begun to experience several different physical
symptoms, including nausea, vomiting, and reported general malaise
and a dry cough over the prior 2 days. Both vomiting and cough
were known symptoms of COVID-19 at that time." According to this
inmate's medical records, between March 22 and 26 Lompoc medical
staff examined this inmate on four separate days before he was
admitted to the local hospital...." (id) (pg. 6, para. 1) ("Based on the BOP
already having identified Lompoc as residing in an area of [redacted]

## COVID-19 IN LOMPOC

sustained community transmission, which resulted in the institution implementing enhanced screening protocols for staff by March 16. [the OIG believe[s] that Lompoc should have taken greater precautions to isolate an inmate with an indeterminate illness that could have been related to COVID-19. Keeping this inmate in general population for several days increased the risk of COVID-19 transmission to staff and other inmates.") Note

On April 10, Lompoc "resolved" the staff testing question by responding positively, to inquiries from Santa Barbara County Health Department, in their effort to stem cross-infections from FCC staff into the local community. (OIG's PRR 20-036, pg. 6, para. 4)("Executive Staff sent emails to all staff informing them they could be tested at the Lompoc Health Care Center... At the time of our inspection in early May, at least 53 of the 416 staff members at FCC Lompoc had been tested and approximately 60 percent (32 of 53) of those individuals had tested positive for the virus.") It should be noted here that, not only was the staff testing turnout dismal, only 109 of the 416 F.C.C. staff, (OIG PRR 20-036, pg. 8, para. 3) even bothered to respond to the Inspector General's pandemic survey. It is evident from these numbers that apathy among FCC staff was and is not just a generalized concern, but it, along with incompetence, were a reality at Lompoc.

While Lompoc inmates were eventually issued cloth face masks on April 6, it is worthy of note that (OIG PRR 20-036, pg. 7, Note 26 ("The CDC does not consider cloth face coverings to be PPE.") Even a local [government employee] (id. pg. 8, Note 30)("union official expressed to the OIG concern about the quality of the face coverings comparing the material to burlap and stating that N95 respirators prevent 95 percent of contaminants...").

Despite staff being aware that, (id. pg. 8, para. 2)("asymptomatic individuals could spread the virus... the BOP stated that proactively distributing face masks... was not a proven evidence-based strategy ...[and] would not have been appropriate" prior to April 3,

## COVID-19 IN LOMPOC

they also acknowledge that "in hindsight, inmates and staff not wearing face masks" prior to April 3, "probably contributed greatly to COVID-19 spread across FCC Lompoc.") (OIG's P.R.R. 20-036, pg. 8, para. 3) ("In addition, although Lompoc officials maintained that the institution had sufficient levels of PPE at the time of [the OIG's] inspection, 70 percent (76 of 109) of Lompoc staff who responded to our survey indicated that more PPE for staff was an immediate need and 46 percent (50 of 109) of Lompoc staff who responded to our survey, reported that inmates needed more PPE as well. Most commonly, Lompoc staff reported that the institution needed to provide staff with additional N95 respirators to adequately safeguard them from contracting the virus, particularly considering the widespread outbreak across the institution." An honest, if decidedly self-centered, assessment of the situation.)

(OIG's P.R.R. 20-036, pg. 9, para. 2) ("Lack of Permanent Leadership and Communication Protocols. A lieutenant, who had served as an acting Deputy Captain during the outbreak, told the OIG that having permanent, seasoned leadership at the onset of the outbreak would have benifited the Complex's COVID-19 response. We observed that FCC Lompoc had been led by three different officials serving as acting Complex Warden since the onset of the institution's outbreak and more than

13

## COVID-19 IN LOMPOC

half (9 of 14) of the Lompoc Management Officials we interviewed were TDY staff or institution staff who had operated in an acting capacity since March ). (Note: 33)("In April, 2020, TDY staff assumed the Complex Warden, FCI Warden, FCI Deputy Captain, Operations Lieutenant, and two Associate Warden positions. The Deputy Case Management Coordinator position had been assumed by institution staff operating in an acting capacity. On June 7, a new permanent Complex Warden was designated to FCC Lompoc ). While the Complex was essentially without leadership, a particularly insidious occurance certainly contributed to the Complexes troubles.) (OIG: PRR, 20-086 pg. 9, para. 3)("In addition, a union official reported to [the OIG] that during the early stages of the outbreak the institution did not inform staff members that they had been in close contact with a colleague who had tested positive for COVID-19. This failure to inform staff members of their contact with an infected person meant the BOP staff who had possibly been exposed to the virus - and therefore could themselves have been infected - were potentially exposing colleagues, inmates and family members") As disturbing as all of these failures have been, it just keeps getting worse. On April 21, A-Unit Manager Webster did a walk through, sans mask or gloves, at 9:15 AM, of the second floor of A-Unit. While this is disturbing in it's own right, he then loudly proclaimed that he ▓▓▓▓▓

had just worked for the last 30 days at the U.S.P next door which, at that time, was rife with COVID-19. When asked by an inmate "then why are you contaminating us?" he made no reply and exited the floor. And he's Unit Manager! The basic COVID-19 hygienic kits were the exact same kits we were issued before the pandemic. (OIG PRR 20-086 pg. 11, para. 2 ("...staff members provided...kits that contained a razor, a toothbrush, toothpaste, and soap bars... Despite these kits 36 percent (39 of 109) of Lompoc staff who responded to our survey reported that more personal hygiene supplies, including soap and hand sanitizers, was an immediate need for inmates. With regard to staff, a Lompoc manager told us that the institution maintained adequate supplies and indicated that there were hand sanitizer stations for staff on every unit and in other locations throughout the institution.") Interestingly, the "Lompoc Manager" failed to inform the OIG that, while staff had plenty of supplies, inmates had no hand sanitizer, no paper towels, toilet paper was and is still (in ~~June of '21~~) being rationed, and all hand sanitizer stations are beyond locked doors and gates with limited to no access provided to inmates.

In addition to apathy, lack of leadership, and ignorance, all of which has an easy remedy; F.C.I. Lompoc suffers from inherent design flaws which result from its' being re-purposed from a World War II era baracks, into its' present use as a penal institution. While there are two units of relatively modern (cont.

## COVID-19 IN LOMPOC

construction, they to suffer from the design flaw of being overcrowded, open dorm style housing, not at all conducive to any type of social distancing. (OIG PRR 20-086, pg. 11, para. 3) ("[The OIG] observed that, despite FCC Lompocs efforts, it's infrastructure may have limited it's ability to implement the CDC's social distancing guidelines... inmates congregate in common areas which can facilitate rapid community spread. Infrastructure issues are particularly concerning at the FCI, where inmates are housed open dormitory style with bunk beds 3 feet apart from each other." (note 40: "The CDC advised that people stay at least 6 feet apart.")
(OIG PRR 20-086, pg. 12, para. 1) (... FCC Lompoc Executive Staff reported the infrastructure concerns to the Office of the Attorney General on April 16. FCC Lompoc subsequently alleviated some of the issues by setting up cots in the FCI's gym and a closed UNICOR factory." Further, in response to the formal draft of this report, the BOP stated that Lompoc added a total of 252 beds in non-housing locations such as the chapel the visiting room, tents, and in a Residential Drug Treatment Program Space in addition to the locations already mentioned. Still social distancing issues remained at the FCI and, by May 11 the BOP reported that 77 percent (891 of 1,162) of all FCI inmates had tested positive for COVID-19 and were considered active cases.")
While it's true that the FCI did create bed space in the gym and the UNICOR building, there was a dispute between the FCI and UNICOR officials, and the result was construction there was never completed, so with only one shower, the building was vacated on or before August 10. The tents were completed within a month of Santa Barbara County Health Department via their spokesperson on ABC radio (106.3 fm), voicing concerns that federal inmates were occupying 28% of hospital beds in the County. That broadcast took place on April 16, and the "MediTents" were completed by May 15. The tents were populated by less than 20 inmates by May 21 (cont.)

## COVID-19 IN LOMPOC

and vacated on May 29, eight days later. To the movant's direct knowledge, none of the other aforementioned were ever used as housing, with the exception of the gym and the UNICOR building, with the gym being vacated by May 21, and UNICOR shortly thereafter.

Lompoc F.C.I., instituted testing of all asymptomatic inmates on May 4, and it finished pharangeal swabbing inmates the next day. It should be noted that at no time did the movant witness testing personell change gloves between inmates, nor even between different housing (A-B) units or floors.

As movant has conclusively shown, the Bureau of Prisons, F.C.C, Lompoc Executive Staff, as well as the vast majority of lower ranking staff, were absolutely incapable of minimizing and/or mitigating the effects and dangers of the COVID-19 pandemic, behind the walls and razor wire of Lompoc institutions. Even under the "boots on the ground" leadership and guidance of an Assistant Director of the Bureau of Prisons (OIG; PRR 20-086, pg. 19, para 2)("... a BOP Assistant Director, who served as Lompoc's acting Complex Warden from May 6 to June 5..."), they all failed completely to keep their charges, or indeed, each other safe.

The movant posits that, in light of the utter failure of everything the BOP, in general, and F.C.C Lompoc Executive Staff, in particular, did or failed to do, to stem the tide of COVID-19, it was or should have been, apparent no later than April 3, that an immediate and substantial reduction in the population of inmates at the F.C.I. was necessary to promote the safety of inmates and staff alike, (see Attorney General's April 3, 2020, Memorandum).

Amazingly, by that date, both the BOP, writ large, as well as the F.C.C. Lompoc Executive Staff, had the impetus and the authority to do just that. Yet, for all practical purposes, they did exceedingly little to reduce the inmate population and just sat by and watched the disaster unfold.

17

# COVID-19 IN LOMPOC

Movant would further posit, as if the litany of failures, incompetence and obfuscation detailed in the Office of the Inspector General's Pandemic Response Report were not enough, that almost exactly one year after the study done by the DOJ/OIG, not much had changed at Lompoc FCC.

Dr. Homer Venters, MD, a virologist who inspected Lompoc FCC, under the aegis of expert witness for the Plaintiffs in *Torres, et al, v Milusnic, et al* CV20-4450-CBM-(PVCx), last September (2020) as well as April 20-21 2021. The report resulting from the latest inspection, hereafter EXHIBIT 3, in the present action.

## (DR. VENTER'S REPORT)

Movant posits that Dr. Venters has a good understanding of what movant and his fellow prisoners face from the pandemic in Lompoc, with ("disproportionate levels of morbidity and mortality in carceral settings... people in jail and prison are 3 to 5 times more likely to contract COVID-19 with an increased risk of death.") (EX. 3, pg. 2, at 4.).

When Dr. Venters performed his inspection of Lompoc F.C.C. BOP already suffered nearly 46 thousand cases of infection ("with 234 deaths among incarcerated people and 4 deaths among staff"). Dr. Venters noted that these numbers represent ("a tripling of total cases and doubling in total deaths"), since his initial inspection in September, 2020. While the Bureau's total ratio of inmate to staff rates of infection remained at ("roughly 7:1") current data reveals ("there are now more active cases among staff") (EX. 3, pg. 2, at 5.), than among inmates.

①

18

## LET'S PRETEND IT NEVER HAPPENED

While the BOP reported an additional 95 cases of COVID-19, their claim that there had been ("no COVID-19 related hospitilizations") (EX. 3, pg. 2, at 6.) was an obfuscation or concealing of documented fact which, once again BOP attempted to hide. There had in fact been, not only a "hospitalization," but the record (BOP Mortality Reviews) clearly show this 62 year old Lompoc inmate contracted COVID-19 in May, 2020, "had never recovered from his initial illness and after nursing home treatment, hospital transfer and intensive care treatment he ultimately succumbed to the complications of his COVID-19 infection. His cause of death is clearly identified as 'Respiratory failure/Respiratory arrest secondary to paralysis secondary to COVID-19,' these facts certainly seem to contradict the BOP's Mortality Reviews report to Dr. Venters on April 21, 2021 that ("[t]here have been zero hospitalizations for COVID-19-related illness since September 2, 2021") despite the fact that 3 inmate deaths had occurred, one each on 12/15/20, 1/19/20 and 2/23/21. Despite the death of another inmate, ("with a history of hypertension, extensive cardiac disease including heart attack, and COVID-19 in June 2020 who died from intracranial hemorrhage. His medical records include a report of an extended period of not receiving his medications without mention in the mortality review.") unbelievably ("[t]he BOP mortality reviews for all three deaths found the care these patients received to be appropriate and acceptable and in each case, under recommendations, is written 'None at this time.'), (EX. 3, pg. 16 at 25; pgs. 24 and 25, at Recommendation 8; and pgs. 21 and 22 at e.)

# COVID-19 IN LOMPOC
## ACCURATE MEDICAL RECORDS?

Movant would hold that his medical records are, at best, only partially accurate, and at worse, life threateningly so. However, the most alarming part of this holding is that his health care is not the only one at question.

Keeping in mind that most inmates were effectively intimidated into not approaching Dr. Venters there were still multiple reports by inmates of questionable Health Services practices. Some ("expressed concern that their care level was moved from 2 to 1... they thought this was done to lessen the frequency of medical encounters for their chronic health issues and that they had not been informed or consulted about this change, but had noticed on their medical records.") (EX. 3 pg. 12, at e.) while several others ("expressed concern about inconsistency between their medical records and [H]ome [C]onfinement [R]eview Worksheet paperwork.... I was shown BOP forms that appeared to indicate people had 'no underlying conditions' and other paperwork from peoples' medical records that indicated multiple chronic health problems.") (id., at f.) ("Nine people reported concerns about delays in chronic care and sick call responses...) (id., at g.) while four reported an improvement in access.

# COVID-19 IN LOMPOC
## THE PERFORMATIVE NATURE...
## A CONSPIRACY OF ARTIFICE AND DECEPTION

In the concerted effort to portray F.C.C. Lompoc, and it's attendant efforts to mitigate the potential spread of the virus, movant would hold that Dr. Venters' observations of the ("performative nature") (EX. 3, pg. 26, at F, Summary) of the way the scene was ("prepared") (id) conveyed the very essence of the two faces of the Bureau of Prisons: the steadfast bulwark that in keeping it's charges secure while also protecting the public, simultaneously puts forth an enormous effort to keep those same charges safe and healthy in as humane a fashion as humanly possible.

At F.C.C. Lompoc this is a facade. Movant would hold that at his Complex there are indeed two faces to the BOP, but the Administrative to Executive level staff that dictate how the Complex is to be run would more accurately be described as Industries. They portray one face to the Powers that Be such as the Western Regional Director, BOP Director Carvahal and the imminent virologist Dr. Homer Venters. That face is maintained during so-called "Inspections," which are announced to the Complex Executive staff well in advance, and preparations for which are much choreographed and stage managed. (EX. 3, pg. 10 and 11, at c.)

The first signs that an "Inspection" is imminent are the institution wide deployment of painting crews. Wholesale waxing of floors, that have not seen a coat of wax since the last "Inspection," is also a clear indicator. Flowers are planted and landscaping is generally tidied up. The last thing done after days or weeks of preparations soap dispensers are filled, and paper towels are placed in the bathrooms. As the actual "Inspections" are about to take place senior staff

# COVID IN LOMPOC
## (THE PERFOMATIVE NATURE...)

are strategically located to pre-emt, or at least discourage, any embarassing inmate attempts to approach and/or engage the visiting dignitaries. The facade of an efficient and orderly ran institution must be maintained at all costs. (EX. 3, pgs. 10 and 11, atc.)

Some of the inmates who would not be discouraged ("reported that in the days before my, they were directed by security staff on how to answer my questions. Several people specifically reported that security staff told them to report that they alway wipe down common surfaces...[these] people also reported that they had never once done this.") (Id.)

On April 20, 2021, Dr. Venters made an inspection of movants' A-Unit Dorm. He was highly accessible to the residents, at least as far as the Doctor knew. What he could not have known was that the helpfull entourage of Interim Warden Engelmann, Assistant Warden Rodriguez, Special Investigative Services Investigator Dockery, Deputy Captain (now A.W.) Martinez (who issued a "Direct Order" to inmate K., denying him access to the unawares Dr. Venters, who was seated around the corner of the doorway to the 3rd floor T.V. Room.), Lieutenant White, as well other assorted "Staff," were, at least in the case of everybody other than Engelmann, and Health Services Coordinator Cross, present merely to intimidate those inmates, who might be foolish enough to approach Dr. Venters. These "escorts" certainly were not present to keep Dr. Venters safe. Aside from Martinez's previously mentioned act of intimidation, the S.I.S Investigator posted herself immediately outside the open door of the 2nd floor T.V. Room (where Dr. Venters was interviewing the inmates) with both a clipboard, and a video camera. To gain access to the Doctor, she required the inmate to surrender his I.D., which she then logged on the clipboard. Movant would posit that their aggressive demeanor was uncalled for, there was certainly no need for the 6 or 7 officers, to line either side of the hallway, right outside the T.V. Room. The S.I.S. lady with the camera was never –

## COVID-19 IN LOMPOC

more than 10' away with a direct line of sight to the inmate, who was answering the Doctors questions. Most of the dozen or so inmates had medical records which Doctor Venters stated he "was told by Staff [he] could not touch," so they were forced to hold them while the Doctor read them and took notes. All of this, with the S.I.S. Investigator 10' feet away w/Lt. Cook, and Deputy Capt. Martinez, immediately across from and beside her, with the rest beside them, and all but the S.I.S. Investigator, out of sight of Dr. Venters, sitting in the room.

Movant would hold that there are 120 lb. female, CO's that walk through and work, in all parts of this Low Security institution, all by themselves. Inmates prone to violence are a rarity here, unless it's towards children, and there aren't any children here at F.C.I. Lompoc.

No, the massive security detail was strictly to intimidate inmates, and judging by the poor turnout ("[Venters] spoke to 67 detained people"...)(EX. 3, pg. 4, at 10.), which is a very small percentage of the population of FCC Lompoc's 2000 some inmates, the intimidation factor worked.

## VACCINATIONS? TAKE IT OR LEAVE IT!

Over a year into this pandemic ("[t]he BOP Lompoc team indicated that 95% of [inmates] had been offered vaccination, as had all staff, and that rates of acceptance were roughly 50% for staff and [inmates].) (EX. 3, pg. 4, at 11.)." The team "indicated that, despite the dismal acceptance rates among staff (and inmates) little effort was spent, nor progress made, towards getting more staff or inmates, vaccinated. ("No surveys of staff or [inmates] had been conducted to date regarding COVID-19 vaccination - per the team.) (id). ("[T]here appear little effort focused on engaging staff and [inmates] about their questions or concerns regarding the vaccine...[t]his is consistent with the reports of the patients themselves, many of whom reported that despite having questions..., these questions were not addressed... By taking the time to listen to their concerns and answer their questions, we can help people become confident in their decision to be vaccinated.'), (id., pg. 19, at a.).

⑤    Movant posits that he has questions and concerns about vaccination, -

which are summarily dismissed by the "take it or leave it" attitude of H.S. staff. (EX. 3, pg. 23 at d.)

## NO SCREENING OF INMATES

While ("[t]he staff intake screening process continues to operate in a manner that effectively checks each staff member.... [for] COVID-19 symptoms....) (EX. 3, pg. 17 at b.), ("[i]t is apparent that BOP Lompoc has failed to implement screening of inmate workers since this issue was raised in my prior inspection report, leading me to conclude that they and the BOP view the screening of workers as unimportant or trivial to their COVID-19 response. I am dismayed that despite multiple assurances on my first inspection that this process was in place, and clear evidence that it was not I returned six months later to be told once again that this process was occurring and find the same complete lack of screening of workers. This failure might be of lesser consequence if no new cases of COVID-19 had occurred, but there have been 95 [new] cases of COVID-19 among [inmates] since this issue was raised. During [my] time [with the Interim Warden], he showed me a screening documentation form that he proposed implementing throughout Lompoc facilities.) (EX. 3 pg. 20, at b.).

Movant would hold that, while future good intentions may sound promising, the reality, over the last 14 odd months in Lompoc F.C.C, is that the failure to implement an effective inmate worker protocol left one more avenue for the virus to spread. In Dr. Venter's Report, he ("spoke with 49 people [inmate workers] who reported having a work assignment[.] None of them reported ever being screened by staff for symptoms of COVID-19... [these workers] included food service... chapel... education, in recreation...") (EX. 3 pg 9 at b.).